UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| CHARLOTTE JOHNSON and NELVIN JOHNSON,<br><br>          Plaintiffs,<br><br>     v.<br><br>PNC MORTGAGE, DIVISION OF PNC BANK, NATIONAL ASSOCIATION; U.S. BANK, NATIONAL ASSOCIATION; and DOES 1-10;<br><br>          Defendants.<br>_____ / | No. C 14-02976 LB<br><br>**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>[ECF No. 21] |

## INTRODUCTION

This case involves a residential mortgage loan. Plaintiffs Charlotte and Nelvin Johnson allege that, in handling their requests for a loan modification, and in servicing their loan more generally, the defendants violated California's Homeowner Bill of Rights.

The Johnsons sued PNC Mortgage and U.S. Bank in Napa County Superior Court. *See* (Complaint, ECF No. 1 at 5-21.)[1]  PNC removed the case to this court based on diversity jurisdiction. (Notice of Removal, ECF No. 1 at 1.)  (When it removed the case, PNC was the only defendant that had been served. *See* (ECF No. 1 at 2 (¶ 6)); 28 U.S.C. § 1446(b)(2)(A).)  All parties

---

[1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

have consented to the undersigned's jurisdiction. (ECF Nos. 7, 11.)

The operative complaint is the First Amended Complaint ("FAC"). (ECF No. 18.) The Johnsons there advance four claims: 1) negligence; 2) unfair business practices under California Civil Code §§ 2923.7 and 17200; 3) robo-signing in violation of California Civil Code § 2924.12; and 4) statutory cancellation of the assignment under California Civil Code § 3214. (ECF No. 18 at 2-14.)

This is the second time the defendants have moved to dismiss the Johnsons' claims. The court granted the defendants' first motion to dismiss and gave the Johnsons leave to amend their complaint. (ECF Nos. 6 (motion), 14 (order).) On July 7, 2014, PNC and U.S. Bank moved to dismiss the FAC under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* (ECF No. 21.) The Johnsons filed a timely opposition (ECF No. 12), and the defendants replied (ECF No. 13). The court finds this matter suitable for determination without oral argument. *See* Civil L.R. 7-1(b). For the reasons discussed below, the court grants the defendants' motion.

**STATEMENT**

**I. Mr. and Mrs. Johnsons' Mortgage**

Plaintiffs Nelvin L. Johnson and Charlotte Johnson are joint owners of 414 Knightsbridge Way, American Canyon, California. (FAC, ECF No. 18 ¶ 1.) They are married to each other and are more than 65 years old. (*Id.*) Defendant PNC Mortgage is a division of PNC Bank, N.A., a national banking association with its home office in Delaware and its principal place of business in Pittsburgh, Pennsylvania. (Notice of Removal, ECF No. 1 ¶ 3; ECF No. 18 ¶ 2.) Defendant U.S. Bank, N.A. is a national banking association with its home office in Ohio and principal place of business in Minneapolis, Minnesota. (ECF No. 1 ¶ 3; ECF No. 18 ¶ 2.)

In 2005, Mr. and Mrs. Johnson borrowed $450,000 from Commonwealth United Mortgage under a ten-year, interest-only, fixed-rate note. *See* (ECF No. 18 ¶¶ 5-6.) The mortgage was secured by a Deed of Trust in favor of Commonwealth, "under which legal title to the Subject Property would be held by National City Bank of Indiana as Trustee." (*Id.* ¶ 5.) During all relevant times, PNC has held itself out as the servicer of the Johnsons' mortgage. (*Id.* ¶ 7.) The Johnsons' monthly payments under their note were set at $2,437.50 for the first 120 months of the loan and $3,355.08

thereafter. (*Id.* ¶ 6.)

On January 29, 2013, invoking California's Homeowner Bill of Rights ("HBOR"), Mr. and Mrs. Johnson sent PNC a demand for proof that PNC was the servicer authorized to collect on their loan. *See* (*id.* ¶ 30.) On about April 8, 2013, PNC responded by sending Mr. and Mrs. Johnson documents. *See* (*id.* ¶¶ 31-34.) One of the documents was an "un-endorsed certified true and correct copy of the Note." (*Id.* ¶ 47.) PNC also sent the Johnsons an "Assignment of Deed of Trust" that "recited and sought to transfer Commonwealth['s] . . . interest in [the Johnsons'] Deed of Trust to 'Banc of America Funding Corporation Mortgage Pass-Th[r]ough Certificates, Series 2006-2 U.S. Bank National Association as Trustee, by PNC Bank, National Association as Servicer with delegated authority under the transaction documents.'" (*Id.* ¶ 34.) The assignment was executed by "PNC Bank, National Association, successor by merger to National City Mortgage, a division of National City Bank." (*Id.* ¶ 35.)

The Johnsons allege that Commonwealth (their original mortgage lender) never assigned its interest in the Note or the Deed of Trust to any other entity, including National City Bank of Indiana. *See* (*id.* ¶¶ 35-38, 40.) Therefore, PNC lacked "apparent authority to assign the interest of 'National City Bank of Indiana'" and failed to establish that any of the entities on the face of the assignment have an interest in the property. (*Id.* ¶¶ 35-38.) This means that the assignment is void. (*Id.* ¶ 53.) The Johnsons also allege that the assignment was "robosigned without reliance on competent or reliable evidence to substantiate the right to foreclose, including the borrower's loan status and loan information" in violation of California Civil Code § 2924.17(b). *See* (*id.* ¶¶ 39-40.) Instead, PNC "had the assignment created in order to create its own evidence, which was knowingly without basis in truth and that PNC did record the assignment illegally." (*Id.* ¶ 40.)

**II. The Johnsons' Loan-Modification Applications**

The Johnsons applied for a mortgage modification, which PNC granted in or about May 2013. *See* (*id.* ¶ 9.) (At some point, the Johnsons asked for their application to be handled by a single point of contact, but their request was not granted. *See* (*id.* ¶¶ 21-22.)) PNC had promised that it would negotiate more affordable terms with Mr. and Mrs. Johnson because their income had decreased

after they retired. (*Id.* ¶ 9.) Because the sole purpose of the modification was to alleviate the Johnsons' financial hardship, they expected the modification would be affordable to them. (*Id.*) Mr. and Mrs. Johnson received a written loan-modification offer with an increasing interest rate and monthly payment. (*Id. ¶* 11.) As modified, the loan balance would be $469,676.27 and the maturity date would be December 1, 2035. (*Id.*) Beginning July 2013, Mr. and Mrs. Johnson would pay $2,161.00 per month with 2% interest. (*Id.*) On July 1, 2016, the interest rate would increase to 3% with $2,364.84 monthly payments. (*Id.*) Finally, in July 2017, the interest rate would increase to 3.75% and the monthly payments to $2,516.98. (*Id.*) PNC promised to keep the offer open until June 12, 2013. (*Id.*)

Before the modification offer expired, the Johnsons sent the defendants a letter asking whether they could negotiate the modification terms because they still could not afford the proposed payments. (*Id.* ¶ 12.) They asked whether they could cap the interest rate at 2.5% or, alternatively, they were willing to extend the payments over a 40-year term. (*Id.* ¶ 11.) Mr. and Mrs. Johnson allege that this would have lowered their monthly payments significantly, while ensuring a higher net benefit to Defendants. (*Id.*)

Defendants responded by denying Mr. and Mrs. Johnson's proposed modification and rescinding their May 2013 modification offer, "on the alleged grounds that plaintiffs had rejected [that] offer by asking for negotiation as promised." (*Id.* ¶ 13.) As a result, Mr. and Mrs. Johnson were forced to appeal the rejection of their loan-modification application, though their appeal was unsuccessful. (*Id.*)

The Johnsons then submitted a new loan-modification application to PNC. See *(*id. *¶* 16.*)* They again asked for a single point of contact. (*Id.* ¶ 21.) PNC acknowledged receiving the Johnsons' new application and asked for additional documents by January 3, 2014. *See* (*id.* ¶ 26.d.) The Johnsons sent those documents. On January 16, 2014, PNC rejected the Johnsons' application. (*Id.*) The Johnsons were not allowed to speak with anyone who was familiar with their prior application, the supplementation, or "the bank's mistake." (*Id.* ¶ 26.) Instead, they were instructed to start the loan-modification process over again. (*Id.*)

The Johnsons restarted the loan-modification process again on January 16, 2014. *See* (*id.* ¶ 26.)

This delay meant that the banks' consideration of their loan modification "would be on a higher principal balance, and over a shorter amortization period under the original term." (*Id.*)

The Johnsons asked that their January 2014 application be handled by a single point of contact and expected this would occur, but it did not. (*Id.* ¶¶ 21-22.) A representative named Susan was assigned to be their single point of contact. (*Id.* ¶ 23.) Nonetheless, on January 23, 2014, a representative named Elyssa explained that Mr. and Mrs. Johnson had "a named 'single point of contact, Susan, who works with Elessa, that they are 'ALL single point of contacts', and that any of them can help you." (*Id.* ¶ 23) (spelling and punctuation in original). Between January 23, 2014 and the time they filed their complaint, every time they called PNC, the Johnsons reached a different representative, "and never Susan." (*Id.*) The Johnsons conclude: "Defendants in fact do not assign individuals or teams, but instead PNC has created a department, called all the reps 'Single Points of Contact', and then continue in operations as like [*sic*] a hotline . . . ." (*Id.* ¶ 24.)

As a result of PNC's failure to designate a single point of contact, Mr. and Mrs. Johnson received conflicting information, including the following examples. (*Id.* ¶¶ 25-26.) First, at least five times between January and May 2014, Mr. and Mrs. Johnson called PNC, asked to speak with their single point of contact, but were never able to speak with her. (*Id.* ¶ 26.) During the same period, the Johnsons repeatedly called PNC to discuss what further documents were needed on their January 2014 application, and each time they received a different list of documents. (*Id.*)[2] Also between January and May 2014, they called PNC at least five times, stated that they do not have any investment income, and explained that they do not own an investment property, only a timeshare that does not provide them with income. (*Id.*) During subsequent calls, the representatives "had no recollection, notes, or indication of any familiarity of knowledge of plaintiff[s'] situation in this regard." (*Id.*) The Johnsons also allege that PNC miscalculated their income, overstating it by "several hundred dollars per month." (*Id.* ¶ 17.) This, they say, was "materially incorrect and ultimately "resulted in unaffordable mortgage payments." (*Id.*)

The Johnsons were eventually approved for and agreed to a new loan modification. (*See id.*

---

[2] It is unclear whether these are the same conversations referenced in the previous and subsequent sentences.

*¶¶* 16, 25-27.) This modification entailed higher payments than the initially proposed one. (*Id.*) The Johnsons allege that the defendants' conduct led to the wrongful rejection of their November 2013 loan-modification application and caused them to agree to an ultimate modification on less favorable terms, as well as causing them to incur the cost of multiple overnight mailings and hire attorneys. See (*id. ¶¶* 15, 19, 26-27.)

## ANALYSIS

### I. Legal Standard

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See id*. at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

If the court dismisses the complaint, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*quoting Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990)). When a party repeatedly fails to cure deficiencies, however, the court may order dismissal without leave to amend. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) (affirming dismissal with prejudice

1  where district court had instructed *pro se* plaintiff regarding deficiencies in prior order dismissing
2  claim with leave to amend).

## II.   Subject-Matter Jurisdiction

The Johnsons suggest that the court "may" lack subject-matter jurisdiction following the amendments to their complaint. Their "remaining claims," they write, "pray for a little over $57,000.00 and do not exceed this court's $75,000 requisite" — meaning, of course, the minimum amount in controversy that 28 U.S.C. § 1332(a) requires for diversity jurisdiction. (ECF 23 at 1.) The "plaintiffs [thus] submit that the basis for diversity [jurisdiction] may no longer exist." (ECF 25 at 1.)

The Johnsons make two mistakes. First, on its face, the First Amended Complaint seeks more than $75,000. The negligence claim seeks "$57,794.41" as the difference between the loan modification they rejected in May 2013 and the one they later accepted. (ECF 18, ¶ 16.) The robo-signing claim then asks for "$50,000 statutory damages," which is "in addition to" amounts sought elsewhere in the FAC. (*See id.* ¶ 41.) The overall prayer for relief confirms that the Johnsons are seeking the negligence damages, "costs of suit," and "all such further relief as the court deems just and proper." (*Id.* at 14.) That is all well over the $75,000 minimum that is needed to support diversity jurisdiction.

Second, this case was removed to this court. The amount now in controversy is therefore not determinative. The removal statutes provide: "If removal of a civil action is sought on the basis of [diversity] jurisdiction" — as it was here (*see* ECF No. 1 at 1-2 (¶ 2)) — "the sum demanded in good faith *in the initial pleading* shall be deemed to be the amount in controversy . . . ." 28 U.S.C. § 1446(c)(2) (emphasis added). (The statute has exceptions that do not apply here. *See id.*) This means that "jurisdiction must be analyzed on the basis of the pleadings filed at the time of removal *without reference to subsequent amendments.*" *Marcotte v. Gen. Elec. Capital Servs., Inc.*, 709 F. Supp. 2d 994, 996 (S.D. Cal. 2010) (quoting *Sparta Surgical Corp. v. Nat'l Ass'n of Securities Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998) (emphasis added)). It is undisputed that the amount sought by the Johnsons' initial complaint, the amount sought "at the time of removal," was greater than $75,000; the Johnsons' original complaint sought (among other things) the loan-

modification damages they seek now, as well as "$100,000 statutory damages." *See* (ECF 1 at 8, 21).

The court has diversity jurisdiction of this case.

## III.   Negligence

The Johnsons first claim that the defendants negligently handled their loan-modification applications. More specifically, they find in the defendants' conduct two distinct instances of negligence. They first say that the defendants acted negligently by treating their counteroffer as a rejection of PNC's proposed May 2013 modification. (ECF No. 18, ¶ 13.) They next allege that PNC negligently "lost" the appeal that they filed after PNC rejected their counteroffer. (*Id.* ¶ 15; ECF No. 23 at 2.) Both acts, argue the Johnsons, caused them to lose the relatively favorable terms that PNC had offered in May 2013. *See* (ECF No. 18, ¶¶ 15, 19)

### A.   Basic law and the existence of a duty

The elements of a negligence claim are: (1) the existence of a duty to exercise due care; (2) breach of that duty; (3) causation; and (4) damage. *See, e.g., Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 500 (2001). The existence of a duty is a question of law and thus is often suited to Rule 12(b)(6) disposition. *See Avila v. Citrus Cmty. College Dist.*, 38 Cal.4th 148, 161 (2006).

The parties dispute whether the defendants owed the Johnsons a duty of care. The defendants correctly point to the general rule that lenders do not owe borrowers a duty of care unless their involvement in a transaction goes beyond their "conventional role as a mere lender of money." *See, e.g.*, *Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089, 1095-96 (1991); (ECF No. 21 at 4-5). As the California Court of Appeal recently pointed out, however, "*Nymark* does not support the sweeping conclusion that a lender never owes a duty of care to a borrower." *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal. App. 4th 941, 945 (2014). A duty may arise even where the lender remains within its "conventional role" of merely loaning money. *Id.* Deciding whether a lender owes a duty in a given case ad "requires" a court to "balanc[e]" the "non-exhaustive" factors set forth in *Biankaja v. Irving*, 49 Cal.2d 647, 650 (1958). *Alvarez*, 228 Cal. App. 4th at 945-46 and n. 5.

This court recently addressed the "divergent case law" in this area. *Rowland v. JPMorgan*

*Chase Bk., N.A.*, No. 14-0036, 2014 WL 992005, *8-*9 (N.D. Cal. Mar. 12, 2014). The court acknowledged in *Rowland* that California's federal and state "courts are divided on the question of when lenders owe a duty of care to borrowers in the context of . . . loan-modification applications and foreclosure proceedings." *Id.* at *8. The court also recognizes that in this area HBOR likely changes the contours of California negligence law. *See Alvarez*, 228 Cal. App. 4th at 949-51.

The court finds it unnecessary to address whether, under the circumstances alleged here, the defendants owed the Johnsons a duty of care. The Johnsons' negligence claim fails for reasons apart from the existence of an initial duty. Even if the defendants did owe the Johnsons a duty, in other words, the First Amended Complaint still fails to state a legally viable claim.

**B. Treating the Johnsons' counteroffer as a "rejection" cannot constitute a breach of duty**

The Johnsons first complain that PNC negligently treated their counteroffer (in May 2013) as a rejection of the original modification that PNC had proposed. (ECF 18 ¶ 13.) They write: "Because plaintiffs did not withdraw their request for assistance nor reject the offer outright, the defendant failed in its duty to handle the [loan-modification] application with due care by denying it for this reason." *Id.*

This cannot constitute a breach of duty. It is a matter of basic California contract law that — except in special cases not relevant here — a counteroffer normally does reject the offer to which it responds. *See, e.g., Landberg v. Landberg*, 24 Cal. App. 3d 742, 750 (1972) (a "qualified acceptance" constitutes "a new proposal or counteroffer" and "a rejection terminating the [original] offer"). The parties have not identified any authority suggesting that a different rule applies under HBOR. (The Johnsons do assert that, under the federal Homeowner Affordable Modification Program, "defendants are not allowed to misconstrue a request to negotiate as a rejection." (ECF No. 23 at 2.) But they offer no citation to support this claim. And, for the reasons being discussed, it is not clear that PNC "misconstrued" the Johnsons' counteroffer.) When the Johnsons responded to PNC's initially proposed modification by suggesting different terms, therefore, in the eyes of the law they rejected PNC's offer. The Johnsons' reasons for rejecting PNC's first proposal — that they expected more affordable payments, for example, or felt that their counteroffer would also benefit PNC (*see* ECF No. 18 ¶ 12) — do not change this fact. Whatever the Johnsons' motives, PNC was

1  free to treat their counterproposal as a rejection. PNC cannot be held negligent for acting in a
2  manner consistent with black-letter law.

3  **C. The "lost" appeal — No causation and speculative damage**

4  The second head of the Johnsons' negligence claim fails for different reasons. Essentially, the
5  link between the claimed breach and any actionable harm is deficient as a matter of law. The
6  Johnsons allege that, after PNC turned down their counterproposal to the May 2013 offer, they
7  "were forced . . . to appeal [PNC's] rejection of their [loan-modification] application." (ECF No. 18
8  ¶ 15.) Unfortunately, according to the Johnsons, PNC then "lost track of" their appeal. (*Id.*; ECF
9  No. 23 at 2.) The Johnsons allege that this harmed them: The "appeal process . . . would have
10 resulted in plaintiffs' *having a chance* at being granted the May 2013 modification . . . ." (ECF No.
11 18 ¶ 15 (emphasis added).) "Had [PNC] not lost plaintiffs' appeal . . . , they would have received, *or*
12 *at least had a chance to receive* the [modification] on the terms offered on or about May 2013 . . . ."
13 *(Id.* (emphasis added); *see also* ECF No. 23 at 2 (appeal might have granted the Johnsons the "prior
14 modification").)

15 This theory has two fatal deficiencies. First, there is no causal connection between the posited
16 breach (losing track of the appeal) and the claimed damage (a chance to obtain a modification on the
17 terms originally offered). The Johnsons' own allegations show that they lost "a chance to receive"
18 PNC's initially proposed terms, not because of anything that PNC did, but because they themselves
19 rejected those terms.

20 Second, the alleged damage is speculative. The Johnsons allege no facts showing that, if not for
21 PNC's "losing track of" their appeal, they would have certainly, or even probably, been granted a
22 modification on the terms originally offered. The mere "chance" that they might have obtained the
23 terms that they themselves rejected is, for all that the FAC alleges, as likely as the "chance" that they
24 would have been offered different terms — perhaps better than, but perhaps worse than, the May
25 2013 terms or the terms to which they ultimately agreed. The FAC leaves the whole question in
26 speculation. And speculative damage is never actionable: "Whatever the proper measure of
27 damages may be in a given case, the recovery therefor is still subject to the fundamental rule that
28 damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a

legal basis for recovery." *California v. Kinder Morgan Energy Partners, L.P.*, 07-CV-1883, 2013 WL 314825, at *13 (S.D. Cal. Jan. 25, 2013); *see also, e.g., Allen v. United Food & Com. Workers Intern. Union, AFL-CIO, CLC*, 43 F.3d 424, 427 (9th Cir. 1994) ("An action cannot be successfully maintained if . . . the plaintiff's damages are not certain to occur or too speculative to be proven."). The court thus holds that the Johnsons' negligence claim fails as a matter of law.

**IV.    Homeowner Bill of Rights**

The Johnsons' remaining claims all stem from defendants allegedly violating California's Homeowner Bill of Rights ("HBOR"). Generally speaking, HBOR is a California state law that provides protections for homeowners facing foreclosure and reforms some aspects of the foreclosure process. Its purpose is to ensure that homeowners are considered for, and have a meaningful opportunity to obtain, available loss-mitigation options such as loan modifications or other alternatives to foreclosure. HBOR provides a private right of action against loan servicers and trustees for their conduct during foreclosure, as well as during the loan-modification process.

**A. Unfair Business Practices — UCL**

The Johnsons' second claim is for "unfair business practices" under the UCL. The UCL claim is predicated on PNC's failure to appoint a "single point of contact" to handle the Johnsons' loan-modification applications, as required by HBOR § 2923.7. (ECF 18 ¶¶ 21-28.) For the reasons stated below, the court will dismiss this claim.

The UCL prohibits "unfair competition," which is defined as any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*, 20 Cal. 4th 163, 180 (1999). "Virtually any law — federal, state or local — can serve as a predicate for an action under . . . section 17200." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1361 (2010) (quotation omitted). To state a UCL claim for an unlawful business act, a plaintiff must allege facts sufficient to show a violation of some underlying law. *People v. McKale*, 25 Cal. 3d 626, 635 (1979); *see People ex rel. Harris v. Pac Anchor Transp., Inc.*, 195 Cal. App. 4th 765, 773 (2011). Furthermore, to establish standing under the UCL, a plaintiff must "(1) establish a loss or

deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the [unfair competition] . . . ." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis in original); *see* Cal. Bus. & Prof. Code § 17204.

Section 2923.7 of HBOR provides that, when a borrower requests a foreclosure-prevention alternative, such as a loan modification, the servicer must promptly designate a "single point of contact" ("SPOC") to communicate directly with the borrower. Cal. Civ. Code § 2923.7(a). The SPOC can be an individual or a team, but must (among other things) possess sufficient knowledge about foreclosure alternatives, and have access to individuals who have the ability and authority to stop foreclosure proceedings. *See id.* §§ 2923.7(b)-(d). Moreover, "[t]he mortgage servicer shall ensure that each member of the [SPOC] team is knowledgeable about the borrower's situation and current status in the alternatives to foreclosure process." *Id.* § 2923.7(e).[3]

The Johnsons allege that PNC failed to satisfy the SPOC requirements in numerous ways. (ECF No. 18 ¶ 26.) For example, they allege that the person or people ostensibly assigned to them were

---

[3] The SPOC is responsible for all the following:

(1) Communicating the process by which a borrower may apply for an available foreclosure prevention alternative and the deadline for any required submissions to be considered for these options.

(2) Coordinating receipt of all documents associated with available foreclosure prevention alternatives and notifying the borrower of any missing documents necessary to complete the application.

(3) Having access to current information and personnel sufficient to timely, accurately, and adequately inform the borrower of the current status of the foreclosure prevention alternative.

(4) Ensuring that a borrower is considered for all foreclosure prevention alternatives offered by, or through, the mortgage servicer, if any.

(5) Having access to individuals with the ability and authority to stop foreclosure proceedings when necessary.

Cal Civ. Code § 2923.7(b).

not available, on multiple occasions, when the Johnsons called. (*Id.* § 26(a).) They complain that no one was familiar with their situation, so that they had to re-explain things when they called, and they contend that this resulted in PNC overstating their income in calculating their loan modification. (*Id.* ¶¶ 26(c)-(e).) Ultimately, the Johnsons allege, PNC shunted them to a "hotline"; the bank did not assign them a "true single point of contact." (*Id.* ¶¶ 24, 27.)

Though the Johnsons pursue their SPOC claim through the UCL, it may be worth noting that SPOC violations can be actionable directly through HBOR. Section 2924.12(a)(1) of HBOR authorizes injunctive relief for "material" violations of; while § 2924.12(b) allows a plaintiff to recover "actual economic damages" caused by a "material" SPOC violation. Cal. Civ. Code §§ 2924.12(a)-(b).

The Johnsons lack standing to pursue the alleged § 2923.7 violation through the UCL for much the same reasons that undid their negligence claim. In short, their allegations show an insufficient, or even absent, causal link from the alleged SPOC violation to their claimed injury. And that claimed injury remains too uncertain.

Consider first the issue of causation. The Johnsons allege that PNC's failure to maintain a "true" SPOC "resulted in their appeal being lost and their losing the potential of receiving the May 2013 modification" — which, again, carried terms more favorable than those to which they later agreed. (ECF No. 18 ¶ 25.) But, as was true under the negligence claim, the Johnsons lost the May 2013 opportunity, not because of anything that PNC did, but because they themselves effectively rejected the proposed May 2013 terms. Causation is further disrupted, under the Johnsons' allegations, by the fact that the alleged SPOC violations occurred *after* they had rejected PNC's initial proposal. It seems tenuous at best to trace a causal connection from the SPOC violation backward to the earlier loss of a particular modification opportunity.

To the extent that the Johnsons allege a normally forward-looking causal chain, arguing that the alleged SPOC violations caused them to lose a new, more favorable modification, their damages remain speculative. The issues of causation and damages merge into each other. Here, as under the negligence claim, the Johnsons' claimed damages are fundamentally speculative. The Johnsons allege that PNC's failure to provide a "true" SPOC caused them to lose a "potential" modification

1 on the terms that PNC offered in May 2013. (ECF No. 18 ¶ 25.) The court has already discussed
2 why this is inadequately concrete to undergird a viable claim. Damages that exist only in contrast to
3 some other "potential" outcome are, on the most generous assessment, "remote," and are, by
4 definition, "merely possible." *See Kinder Morgan,* 2013 WL 314825 at *13. Such damage *"cannot
5 serve as a legal basis for recovery." Id.* From a Rule 12(b)(6) viewpoint, too, "Factual allegations
6 must be enough to raise a right to relief above the speculative level . . . ." *Twombly,* 550 U.S. at 555.

7 The failure to allege sufficient causation and damages is, again, an issue of standing under the
8 UCL. *See Kwikset*, 51 Cal.4th at 322. Because the Johnsons lack UCL standing, the court does not
9 reach the questions of whether the conduct that the Johnsons allege constitutes a SPOC violation
10 under HBOR § 2923.7 or a "material" SPOC violation under HBOR § 2924.12.

11 **B. Robo-signing**

12 The Johnsons' third claim alleges that, by executing the allegedly inauthentic assignment, PNC
13 violated California's "robo-signing" law, Cal. Civ. Code § 2924.17. (ECF No. 18 ¶¶ 29-40.) The
14 relevant parts of § 2924.17 provide: "Before recording or filing any of the documents described in
15 [§ 2924.17(a)] — which include "assignment[s] of a deed of trust" — "in connection with a
16 foreclosure," or "relative to a foreclosure proceeding," a "mortgage servicer shall ensure that it has
17 reviewed competent and reliable evidence to substantiate the borrower's default and the right to
18 foreclose, including the borrower's loan status and loan information." Cal Civ. Code §§ 2924.17(a)-
19 (b). Section 2924.17 is designed to prevent "robo-signing." *See, e.g., Sanguinetti v. CitiMortgage,
20 Inc.*, No. 12–5424, 2013 WL 4838765 (N.D. Cal. Sept. 11, 2013) ("Section 2924.17 prohibits 'robo-
21 signing,' or executing foreclosure documents without 'substantiat[ing] the borrower's default and the
22 right to foreclose.'").

23 Section 2924.19 of HBOR gives aggrieved homeowners the right to sue for "material violations"
24 of § 2924.17's ban on robo-signing. The Johnsons seek both an injunction under § 2924.19(a) and
25 statutory damages of $50,000, attorney's fees, and costs under § 2924.19(b). (ECF No. 18 ¶ 41.)

26     **1.** *No allegation of foreclosure*

27 The Johnsons' robo-signing claim suffers from at least three independent and fatal deficiencies.
28 First, the FAC does not allege that the assignment was "recorded . . . in connection with a

1 foreclosure" or "filed in . . . court . . . relative to a foreclosure." *See* (ECF No. 18 at 10-13 (¶¶ 29-
2 41)). The most that the Johnsons allege in this regard is that PNC sent them the assignment after
3 they asked the bank for documents showing that PNC had "the right . . . to foreclose" on their loan.
4 (ECF No. 18 ¶ 30.) (The robo-signing claim elsewhere says that the Johnsons received the
5 assignment after asking PNC for proof, not of the bank's right to foreclose, but only that it was the
6 "authorized servicer to collect on their loan." (*Id.* ¶ 34.)) The Johnsons nowhere allege facts
7 suggesting that PNC — or anyone else — took any step toward foreclosure. The parties' most
8 recent case-management statement states that the parties dispute whether there was foreclosure
9 activity in connection with the Johnsons' deed of trust. (ECF No. 25 at 2.) But the FAC says
10 nothing about the matter. If the Johnsons know of facts justifying their position that foreclosure
11 activity did occur, then presumably they could have easily alleged those facts to buttress their robo-
12 signing claim.

13     The court's earlier dismissal order highlighted this deficiency in the Johnsons' pleading and
14 explicitly said: "Should Plaintiffs choose to re-allege [their robo-signing] claim[] in an amended
15 complaint, they also should remedy their failure to allege that the assignment was recorded 'in
16 connection with a foreclosure' as required for liability under [§] 2924.17." (ECF No. 14 at 23 n.
17 24.) The Johnsons have not remedied that failure. Their robo-signing claim remains deficient on
18 this ground.

19     **2.**    *The assignment was not "material"*

20     Second, even assuming that the assignment was robo-signed, the court does not see how this was
21 "material" to the Johnsons' loan. Only "material violation[s]" of the robo-signing law are actionable
22 under § 2924.19. Nothing in the FAC suggests that the assignment affected the Johnsons' loan
23 obligations — apart, perhaps, from changing the entity to whom they send payments — and the FAC
24 in no way indicates that the assignment affected their loan modification. For the court to conclude
25 that there is "material" impact from the fact of assignment alone would be to ignore rudimentary
26 aspects of mortgage law. Assigning a deed of trust does not affect the attendant foreclosure rights.
27 *Cf. Haynes v. EMC Mortg. Corp.*, 205 Cal. App. 4th 329, 336 (2012) (assignments mainly a device
28 for giving notice to prospective buyers). And the challenged assignment did not affect the Johnsons'

1  payment obligations.  Even if the Johnsons are correct, and the assignment is a sham, that would
2  materially affect the original lender — whose rights would have been stolen away.  Beyond the
3  assignor and the assignee, though, an assignment largely operates only to give notice to those who
4  might buy or encumber the subject property.  *See Nan Hui Chen v. Deutsche Bk. Nat'l Trust Co.*,
5  No. C 13-3352 YGR, 2014 WL 2738071, *7 (N.D. Cal. June 9, 2014).  At all lengths, the FAC does
6  not describe facts showing how the allegedly inauthentic, robo-signed assignment was in a relevant
7  sense "material."

8  To this line of reasoning, the Johnsons reply that *any* robo-signed document "materially" violates
9  § 2924.17.  "A *per se* violation is 'material,'" they contend.  (ECF No. 23 at 4.)  They further write:
10  "The question of what is a material violation does not depend on plaintiff suffering damages, or
11  statutory damages would not be available."  (ECF No. 23 at 4.)  If this is not the rule, the Johnsons
12  argue, then the robo-signing statute is "nugatory."  (*Id*.)  And "courts shouldn't make statutes
13  nugatory."  (*Id.*)

14  The court thinks that it is the Johnsons' position that makes part of § 2924.19 nugatory.  They
15  would read the term "material" out of § 2924.19.  The legislature could have made any "violation"
16  of the robo-signing law actionable; but it made actionable only "material violation[s]."  *See*
17  § 2924.19.  The qualifier "material" must mean something.  In this context, in practical meaning,
18  "*per se*" seems almost the opposite of "material."  At the very least, the concepts cannot be identical
19  — a "violation" being automatically a "material violation" — so that the word "material" effectively
20  disappears from the statute.  It is a basic rule of statutory construction that, wherever possible, courts
21  must give effect to all the terms of a statute.  *E.g., In re Pak*, 357 B.R. 549, 551-52 (Bankr. N.D. Cal.
22  2006) (citing *Duncan v. Walker,* 533 U.S. 167, 174 ("It is our duty to give effect, if possible, to
23  every clause and word of a statute." (quotation omitted)).  The Johnsons' argument would drain the
24  word "material" of meaning and so erase it from § 2924.19.  The court cannot accept that
25  interpretation.

26  Nor does it follow from the availability of statutory damages that any violation of § 2924.17 is a
27  material violation.  This is certainly not the logical consequence of anything in §§ 2924.17 or –.19.
28  The simple logic of § 2924.19 runs like this: If there is a "material violation" of § 2923.17, one that

is intentional or reckless, then statutory damages may be awarded. It is hard to see how the statutory damages that conclude this string satisfy, and thus obviate, the materiality requirement. This would yield the very different rule that *any* violation of § 2924.17 justifies statutory damages. The point can be stated differently: The Johnsons' argument suggests that statutory damages can be awarded even where a violation is otherwise *immaterial*. But that is exactly contrary to what § 2924.19 says — though it is almost exactly the argument that the Johnsons make. The Johnsons have not directed the court to any legal authority supporting their view that statutory damages, by the very fact that they are available, make the predicate violation "material." Ultimately, the Johnsons' analysis again abrades the tenet that the court must give effect to all the terms of a statute. It was not enough to simply assert that "[a] *per se* violation is material" — so as to effectively delete the term "material" from § 2924.19. It is equally unpersuasive to bend the statutory-damages provision to the same effect.

### 3. *No allegation that property was sold — no statutory damages*

Finally, § 2924.19 allows a plaintiff to recover "actual economic damages" for a material violation of § 2924.17; where that violation is intentional or reckless, a plaintiff may also recover statutory damages of $50,000. Both types of damages are available, though, only "[a]fter a trustee's deed upon sale has been recorded." § 2924.19(b). The FAC does not allege that the Johnsons' property was ever foreclosed upon, much less sold in foreclosure, and does not claim that a "deed upon sale has been recorded." (*See* ECF No. 18, *passim*.) To the contrary, according to the parties' most recent case-management statement, "the parties do not dispute" that the Johnsons' property "has not been sold at any trustee's or foreclosure sale." (ECF No. 25 at 2.) The Johnsons thus have no claim for damages under § 2924.19. The Johnsons cannot cure this deficiency merely by amending their complaint; if the facts are as the parties say they are, and the Johnsons still own the property, then a claim under § 2924.19(b) could arise only after new and different factual developments — namely, a foreclosure sale. The Johnsons' claim for statutory damages under § 2924.19 will therefore be dismissed with prejudice.

### C. Cancellation of Instruments

The final issue is whether the Johnsons have sufficiently pleaded their claim under Cal. Civ.

Code § 3412, which seeks to cancel the allegedly "robo-signed Assignment." *See* (ECF No. 18 at 13-14 (¶¶ 43-44).) Section 3412 provides:

> A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person *against whom it is void or voidable*, may, upon his application, be so adjudged, and ordered to be delivered up or canceled.

Cal. Civ. Code § 3412.

The court finds this claim legally deficient for two related reasons. First, even if the assignment was "robo-signed" in violation of HBOR, the plaintiffs have not identified any authority showing that the assignment would be "void or voidable" as against them. It is not obvious that it would be. Again, an assignment does not generally affect the foreclosure rights contained in a deed of trust. *Cf. Haynes*, 205 Cal. App. 4th at 336. And, in this case, the Johnsons do not allege that the assignment affected their payment obligations or other mortgage rights. The Johnsons do allege (in sum) that the assignment would legitimize an otherwise wrongful foreclosure sale by these defendants — but the parties agree that no such sale has occurred. (ECF No. 18 at 2.) Elsewhere the Johnsons wax theoretical about how faulty assignments impair fee-simple titles. (ECF No. 23 at 5-6.) That is not unwelcome. But the Johnsons offer no citation to ground their rumination in rules of law. The court finds this untethered discourse insufficient to show either that the allegedly robo-signed assignment was "void or voidable" as against them, or that it threatens to cause them "serious injury."

Second, more simply, the Johnsons' cancellation claim is premised on their robo-signing claim. *See* (ECF No. 18 at 13-14.) The robo-signing claim is legally deficient. It is deficient, moreover, in ways that prevent it from substantively supporting the cancellation claim: There was no foreclosure sale related to the assignment; and the assignment was not material to the Johnsons. Because the underlying robo-signing claim, at least in these circumstances, the related cancellation claim fails as well.

**CONCLUSION**

The court grants the defendants' motion to dismiss, ECF No. 18. The Johnsons' claims are dismissed without prejudice, except for their claim for statutory damages under Cal. Civ. Code § 2924.19, which is dismissed with prejudice. The Johnsons may file an amended complaint by December 11, 2014.

This disposes of ECF No. 18.

**IT IS SO ORDERED.**

Dated: November 21, 2014.

_____
LAUREL BEELER
U.S. Magistrate Judge

**UNITED STATES DISTRICT COURT**
For the Northern District of California