UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| CHARLOTTE JOHNSON, et al., | Case No.14-cv-02976-LB |
| Plaintiffs, | |
| v. | **ORDER GRANTING SUMMARY JUDGMENT** |
| PNC MORTGAGE, et al., | [Re: ECF No. 67] |
| Defendants. | |

### INTRODUCTION

This case involves the allegedly botched modification of a home mortgage loan. The homeowners, plaintiffs Charlotte and Nelvin Johnson, contend that their mortgage-loan servicer, defendant PNC Bank, N.A., mishandled their request for a loan modification by overstating their income. This error (say the Johnsons) resulted in a modified loan payment that they still cannot afford. More specifically, the Johnsons argue that PNC failed to account for the decreased income that would follow Mrs. Johnson's eventual retirement. Mrs. Johnson was not retired when the Johnsons sought a loan modification; she has not yet retired. The Johnsons sue in negligence and under California's Homeowner Bill of Rights. The latter claim is framed as an "unfair business practice" claim under the state's Unfair Competition Law (Cal. Civ. Code § 17200 *et seq.*). The defendants, PNC and U.S. Bank, N.A., move for summary judgment against both claims. (ECF

United States District Court
Northern District of California

No. 67.)[1] The court held a hearing on this motion on February 4, 2016. The court now grants the defendants' motion.

## STATEMENT

The Johnsons own residential real property in American Canyon, California. At all relevant times, PNC serviced their mortgage loan on that property.[2] In December 2013, invoking the federal Homeowner Affordable Modification Program ("HAMP"), the Johnsons applied to PNC to modify their loan.[3] Over the next few months, PNC gathered from the Johnsons information needed to evaluate a potential loan modification.[4] At one point, according to the Johnsons, during a telephone call Nelvin Johnson told a PNC representative that Charlotte Johnson planned to retire and that this would affect their ability to pay any modified loan.[5] In Mr. Johnson's own words:

> I called particular attention to the fact that my wife was retiring and so that [*sic*] we could not rely on her income in the calculation of an affordable [mortgage] payment. . . . I stated that . . . my wife was retiring, and that we would not be able to pay the mortgage when she retires. . . .
>
> I explained that she had not yet retired, but that when she did, we would be in a position not to afford the mortgage.[6]

Mr. Johnson says that the PNC representative "invited us to send documentation related to her retirement."[7] Mr. Johnson does not say that he sent this material.[8] A letter that the Johnsons sent PNC following this phone call lists "retirement documents for Charlotte Johnson" among its

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] It is not clear what role U.S. Bank plays in this case. The Johnsons' complaint alleges that U.S. Bank "considers itself the present beneficiary of the plaintiffs' mortgage." (ECF No. 30 at 2 [¶ 3].) But they make no argument directed toward U.S. Bank's conduct. And, although it has moved for summary judgment along with PNC, U.S. Bank does not figure into the parties' summary-judgment analyses. Indeed, the parties' arguments do not mention U.S. Bank. (*See* ECF Nos. 67, 69, 71, *passim.*) All the material facts involve only the Johnsons and PNC.

[3] Arthur Decl. – ECF No. 67-12 at 2 (¶ 7).

[4] *See id.* at 2-3 (¶¶ 7-11); N. Johnson Decl. – ECF No. 70, *passim*.

[5] N. Johnson Decl. – ECF No. 70 at 3-5 (¶¶ 4-7).

[6] *Id.*

[7] *Id.* at 5 (¶ 7).

[8] *See id.*, *passim.*

United States District Court
Northern District of California

attachments.[9] No such documents are attached to the letter[10] — nor do they appear elsewhere in the evidentiary record.

By late March 2014, the Johnsons had sent PNC everything that the latter said it needed to evaluate the modification request.[11] When it did assess that request, PNC used the version of the "Making Home Affordable Handbook" that was then in effect (version 4.4).[12] In verifying borrowers' income (and insofar as is relevant to this case), the Handbook directs lenders to consider pay stubs and evidence of governmental disability benefits (such as an award letter or payment receipts).[13] The Handbook, expressing HAMP guidelines, considers a modified loan payment affordable where it is no more than 31% of the borrowers' gross income.[14]

PNC calculated Mr. Johnson's gross monthly income from his Social Security Administration disability-benefits paperwork; it calculated Mrs. Johnson's monthly wages from the material that she submitted to support the loan-modification request.[15] The Johnsons agree that PNC correctly calculated their gross monthly income.

(The Johnsons previously claimed that PNC had overstated their monthly income by about $200. This indeed was the gravamen of their complaint. Their allegations and attendant legal theory have since changed, however, as discussed throughout this order. At the summary-judgment

---

[9] N. Johnson Decl. (Ex. F) – ECF No. 70-6 at 4.

[10] *See id.*, *passim*.

[11] Arthur Decl. – ECF No. 67-12 at 2-3 (¶ 11).

[12] *Id.*; *see* Arthur Decl. (Ex. 5) – ECF No. 67-17 (handbook excerpts). The Handbook is promulgated as part of HAMP by the Federal National Home Mortgage Association and the Federal Home Loan Mortgage Corporation, "each in its capacity as financial agent of the United States (as designated by [the U.S. Department of the] Treasury)." *See* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_5.pdf (page 14) (last accessed 3/2/2016).

[13] *See* Handbook – ECF No. 67-17 at 44-46 (§§ 5.1, 5.1.1, and 5.1.4) ("Servicers must request that the borrower provide the income[-]verification documentation listed below . . . .").

[14] *See, e.g.*, 2nd Am. Compl. ("2AC") – ECF No. 30 at 3-4 (¶ 12); Handbook – ECF No. 67-17 at 50 (§ 6.1) ("To qualify for HAMP [modification] . . . , verified income documentation must confirm that the borrower's monthly mortgage payment ratio prior to the modification is greater than 31 percent.").

[15] Arthur Decl. – ECF No. 67-12 at 2 (¶¶ 7-10); Bruggeman Decl. – ECF No. 67-1 at 2 (¶¶ 4, 7).

1    hearing, the plaintiffs agreed that, in evaluating their modification request, PNC correctly

2    calculated their income.)

3       The Johnsons and PNC then entered into a three-month "Trial Period Plan" — which PNC

4    describes (without dispute) as the precursor to a fully blown modification.[16] After completing this

5    trial period, the Johnsons signed the permanent modification agreement whose terms they

6    challenge here.[17] There is no dispute that the modified payment was less than 31% of their gross

7    monthly income. The Johnsons found the new payments still unaffordable. They then filed this

8    suit. Earlier motion practice saw this court dismiss several of the Johnsons' claims under Rule

9    12(b)(6); the Johnsons have twice amended their complaint. Their two remaining claims are in

10    negligence and for "unlawful business practices" under California's Unfair Competition Law (Cal.

11    Civ. Code § 17200). The latter claim is premised on PNC's alleged violation of California's

12    Homeowner Bill of Rights (particularly Cal. Civ. Code § 2923.7).[18]

13       The Johnsons' primary theory now is that PNC overstated their income by failing to account

14    for Mrs. Johnson's planned retirement. The Johnsons contend (in sum) that PNC should have

15    treated her normal wages as temporary income — because her "impending retirement" would

16    bring those wages to an end — and should have reduced the income that it attributed to the

17    Johnsons when it calculated modified loan terms. The Johnsons raised this, and other arguments,

18    for the first time in their opposition to PNC's summary-judgment motion. Because none of their

19    theories raises a genuine issue for trial, the court grants PNC's motion.

20

21                      **SUMMARY-JUDGMENT LAW**

22       The court must grant a motion for summary judgment if the movant shows that there is no

23    genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

24    law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material

25

26

27

28

---

[16] Arthur Decl. – ECF No. 67-12 at 3 (¶ 12).

[17] *Id.* at 3 (¶ 13).

[18] 2AC – ECF No. 30 at 3-9 (¶¶ 8-34).

United States District Court
Northern District of California

facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'").

If the moving party meets its initial burden, the burden then shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence, and it draws all inferences in the light most favorable to the non-moving party. *E.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir. 1991).

# ANALYSIS

The Johnsons' central claim is that PNC overstated their income and so arrived at a modified monthly payment that remains unaffordable. For most of this lawsuit, their more specific claim has been that PNC simply miscalculated their monthly income, using a figure 10% greater than what they actually made, and thus arrived at a modified monthly payment that is "at least $200" greater than it should be and, perhaps more to the point, that is above HAMP's 31% benchmark. This is no longer the Johnsons' claim. They no longer dispute that PNC correctly calculated their actual income. They no longer dispute that their modified payment is below the 31% mark. Thus, insofar as the remaining claims in the Second Amended Complaint rest on the raw-miscalculation theory — and even the Johnsons suggest that that is the *only* pertinent theory in their operative complaint (*see* ECF No. 69 at 8-9) — the court grants PNC summary judgment and dismisses those claims with prejudice. The rest of this order discusses the Johnsons' current main theory, that PNC should have accounted for Mrs. Johnson's plan to eventually retire, and other arguments that the Johnsons have made in opposing summary judgment.

## 1. Negligence

Federal courts sitting in diversity jurisdiction generally apply the substantive law of the forum state. *E.g., Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1941). To raise a *prima facie* claim of negligence in California law, a plaintiff must prove: 1) the existence of a duty to exercise due care; 2) a breach of that duty; 3) causation; and 4) damage. *See, e.g., Merrill v. Navegear, Inc.*, 26 Cal.4th 465, 500 (2001). This court reviewed the applicable law in an earlier ruling in this case and decided that, under California law, once a lender agrees to consider a borrower's request for a residential-mortgage-loan modification,  it owes the borrower a duty to use reasonable care in handling that request. (*See* ECF No. 38 at 5-7) (citing, *inter alia*, *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal. App. 4th 941 (2014)).

### 1.1 Retirement

The Johnsons' negligence claim now reduces primarily to the issue of Mrs. Johnson's planned retirement. The Johnsons allege that they told PNC of Mrs. Johnson's "impending retirement" and argue that the lender should have accounted for this in calculating their income. Because PNC negligently failed to consider Mrs. Johnson's eventual retirement, the plaintiffs conclude, it offered them a modified loan with payment terms that they still could not afford — which constitutes their injury.  (*See* ECF 69 at 5-8, 12).

The Second Amended Complaint does not state or fairly comprehend this theory. The Johnsons raised it for the first time in their opposition to the present summary-judgment motion. (A point they nearly concede. [*See* ECF No. 69 at 8.]) Because both parties fully addressed the retirement issue, both in their briefs and at the hearing, however, and for the sake of completeness, the court addresses it here.[19]

The Johnsons more specifically argue that PNC should have considered the "impending retirement" under the Handbook's income-verification guidelines. The relevant part of the Handbook provides that lenders must maintain a "Verification Policy" and that (among other things) this policy "should describe how the [loan] servicer will":

- "calculate ***non-traditional income scenarios*** such as underemployment, recent employment, overtime, seasonal or sporadic income"; and

- "[m]ake adjustments when it is likely that sources of ***additional income*** (bonus, commissions, ***etc.***) are not likely to continue"

(ECF No. 69 at 7) (citing Handbook – ECF No. 67-17 at 44-45 [§§ 5.1, 5.1.1]) (emphases added). The plaintiffs argue that these terms compelled PNC to account for Mrs. Johnson's planned retirement. "[P]ending retirement," the Johnsons write, is "certainly a 'non-traditional income scenario.'" (ECF No. 69 at 7.) They also contend that, given her plan to retire, Mrs. Johnson's

---

[19] Indeed, none of the negligence theories that this order addresses was explicitly raised or remotely contemplated by the Second Amended Complaint. The Johnsons raised all of them for the first time in opposing PNC's present summary-judgment motion. Because the parties have addressed these theories fully, in briefing and at the summary-judgment hearing, and in the interest of something like judicial economy, the court proceeds to address them.

1    regular wages constitute "additional income" that was "not likely to continue," and that PNC

2    should have considered this under the "etc." term that is reproduced above. (*Id.*)

3         The court disagrees. Multiple problems prevent the court from adopting the Johnsons' position,

4    and from agreeing that it raises a triable negligence claim.

5         First, assume for the moment that a borrower's plan to eventually retire can be treated as a

6    "non-traditional income scenario," or that a borrower's normal wages can be "additional income"

7    under the Handbook's "etc." catchall. Even accepting that, these Handbook provisions address

8    only how loan servicers are to *describe* their income-verification policies — what they must tell

9    borrowers about those policies. These terms do not obviously compel lenders to *adopt* any

10   particular policy with respect to such income — such as disregarding a borrower's normal wages

11   once told that that borrower is planning to retire. At all lengths, the Johnsons have not directed the

12   court to any part of the Handbook, or to existing law, that suggests that these terms compelled, not

13   only what PNC was required to disclose about its income-verification policies, but how PNC was

14   substantively required to handle borrowers' plans to eventually retire. Nothing indicates that the

15   Handbook imposed that particular duty on PNC.

16        Second, removing the provisional assumption, the Johnsons' reading of these terms is sharply

17   counterintuitive. It simply is not convincing to cast someone's normal wages or salary as

18   "sporadic" or "additional" income. Almost everyone hopes to eventually retire. That does not

19   make their normal employment income temporary, "non-traditional," or "additional." The

20   Johnsons' proposed interpretation moreover is at odds with normal rules of construction. The

21   Handbook here names things such as "seasonal," "sporadic," and "bonus" compensation. This is

22   not the same class of thing as one's normal full-time wages. To the contrary, normal wages are —

23   in this context — almost the opposite of the "non-traditional" and "additional" income that the

24   Handbook expressly names. The catchall *et cetera* must be read to contemplate sources of income

25   that are in keeping with the other things specifically named, not to blow open an entry point for

26   anything that a litigant labels "temporary."

27        Third, nothing in the record proves that the Johnsons sent PNC "retirement documents for

28   Charlotte Johnson." It is therefore entirely unclear what PNC could have used to calculate the

United States District Court
Northern District of California

effect of Mrs. Johnson's "impending retirement." The Johnsons argue that PNC somehow should have adjusted its calculations once Mr. Johnson told PNC (in a phone call) that Mrs. Johnson wanted to retire. But that would have cut against the Handbook's mandate. In a rule that on its face is more substantively compulsory than the ones that the Johnsons cite in this area, the Handbook states: "In no event may a [lender's] Verification Policy state that a servicer can rely *solely on [a] borrower's stated income*." (ECF No. 67-17 at 48 [§ 5.1.11]) (emphasis added). Both practically and as a matter of complying with the Handbook's guidelines, PNC could not have adjusted its income calculations merely because Mr. Johnson told them that Mrs. Johnson was planning to retire.

Which leads to the fourth and last consideration. The Johnsons' argument, were it viable, would yield an unworkable loan-modification regime. Their argument thus is not one that the law can countenance. Assume that negligence law did bind PNC to adjust the Johnsons' income to reflect "impending retirement" — and that PNC had to do this without the benefit of some concrete documentation of what that retirement would entail for the Johnsons financially. How, as a practical matter, was PNC to make the appropriate adjustment? How was it to correctly calculate new loan terms? On the Johnsons' position PNC could have done little more than guess at the Johnsons' future income. What if PNC guessed wrong? Would it then be liable for that? In this case, the Johnsons originally claimed that PNC had overstated their monthly income by 10%; this allegedly caused their modified loan payment to be "at least $200 higher" than it should have been. (2AC – ECF No. 30 at 4-5 [¶¶ 13, 21].) Had PNC tried to estimate the Johnsons' post-retirement financial situation, one must imagine that any error could easily have been larger than 10% of the Johnsons' "actual" future income, or more than $200 per month. Were that the rule, lenders would be whipsawed between two poles of liability. The law will not consciously sanction a rule under which actors can do no right.

\* \* \*

The Johnsons' negligence claim must therefore fail as a matter of law. Although PNC had a general duty to use care in handling the Johnsons' loan-modification request, *see Alvarez, supra,* on the undisputed facts of this case, in calculating the Johnsons' monthly income, PNC was under

no duty to somehow account for Mrs. Johnson's plan to eventually retire. Put differently, by not decreasing the Johnsons' monthly income to reflect Mrs. Johnson's planned retirement, PNC did not breach the general duty that it owed the Johnsons.

### 1.2 Imminent default

The Johnsons' remaining arguments are not viable. None raises a genuine issue for trial. For example, they claim that PNC failed to consider whether they were at risk for "imminent default" on their loan. (ECF No. 69 at 5.) Plugging this contention a bit incongruously into their "income after retirement" argument, the Johnsons quote the following Handbook language:

> **Reasonably Foreseeable or Imminent Default for Owner-Occupied Property**
>
> A borrower that is current or has only one payment due and unpaid by the end of the month in which it is due and who contacts the servicer to request HAMP consideration must be evaluated to determine if he or she is at risk of imminent default. Each servicer must have written standards for determining imminent default that are consistent with applicable contractual agreements and accounting standards and must apply the standards equally to all borrowers.

(*Id.*; *see* Handbook –ECF No. 67-17 at 39 [§ 4.4].)

Even if PNC somehow violated this section, it would not give rise to an actionable claim. This provision is part of the Handbook's *eligibility* criteria; that is, it appears in the Handbook rules that a lender must follow in determining whether a borrower who has requested a HAMP modification in fact qualifies for one. (*See* Handbook – ECF No. 67-17 at 4, 15-16, 39.) There is obviously no dispute that PNC found the Johnsons eligible for a modification: they received that modification. It is only the amount of the modified payment that they challenge.

### 1.3 Wrong version of the MHA Handbook

The Johnsons also suggest that PNC used the wrong version of the Handbook when it evaluated their modification request. (ECF No. 69 at 4.) It is undisputed that PNC used version 4.4 of the Handbook. (Arthur Decl. – ECF No. 67-12 at 2-3 [¶ 11].) It is undisputed that this was the version in effect in March 2014, after the Johnsons' application was complete, when PNC evaluated their request. (*Id.*) The Johnsons argue that "there is a material issue as to whether

United States District Court
Northern District of California

1    plaintiff[s'] application . . . should have been reviewed" under an earlier version of the Handbook.

2    (ECF No. 69 at 4.) Specifically, the Johnsons contend that PNC should have used the August 2013

3    version of the Handbook, which was in effect when they "initially" submitted their modification

4    request. (ECF No. 69 at 4.)[20]

5        This theory marks out no issue for trial. The Johnsons have not identified a rule that compelled

6    PNC to use an earlier version of the Handbook. They identify no principle that should have led

7    PNC to consider using a superseded version of the Handbook. They have not provided the version

8    of the Handbook that they contend should have been used. They have not shown that that earlier

9    version included some different relevant rule. And they have not shown that applying an earlier

10   rule would have led PNC to a different result — which is tantamount to saying that the Johnsons

11   have not suggested, through argument or evidence, how they were injured by PNC's not using an

12   earlier version of the Handbook. This all amounts to a wholesale failure to raise a *prima facie*

13   issue on every element of negligence.

14       One more point should be made here. The Johnsons write that PNC's summary-judgment

15   motion must be denied because, "it is impossible to determine what effect following the previous

16   guidebook would have ha[d] on the [loan-modification] application . . . ." (ECF No. 69 at 4.) That

17   does not seem necessarily true. Presumably, if the Johnsons had identified the superseded rule that

18   that they thought PNC should have applied, it would be possible to determine whether this other

19   rule could have changed PNC's evaluation and potentially have led to a different result. (Had an

20   earlier rule compelled a lender to somehow account for a borrower's "impending retirement," for

21   example, that might have affected PNC's assessment in a relevant way.) If it is true, though, that it

22   is "impossible" to say what effect a prior rule would have had, then this also means that the

23   Johnsons cannot recover on their "wrong handbook" theory. For then there would be no way to

24

25

26   _____

     [20] The parties disagree over when the Johnsons applied for this modification. The record does not
27   permit a definite conclusion. There is one application in the record that (consistent with Mr. Johnson's
     declaration) is dated August 12, 2013. (ECF No. 70-1 at 11.) Another application (consistent with
     PNC's declaration) is dated December 20, 2013. (ECF No. 67-15 at 7.) The analysis in the main text
28   will show that this discrepancy is immaterial.

say that not using that earlier version harmed the Johnsons. The posited impossibility would make any conclusion about causation and damage wholly speculative.

### 1.4 Delay

Finally, the Johnsons argue that PNC "negligently delayed review of [their] application from [PNC's] receipt of their final supplement [of application information] on February 22, 2014 to May 14[,] 2014." (ECF No. 69 at 8-9.)[21] The Johnsons acknowledge that this alleged delay was "not addressed in [their] pleadings." (*Id.*) It is instead another argument that they raised for the first time in their summary-judgment opposition.

First, the Johnsons do not explain why they should be allowed to advance this new argument at this stage of the proceedings. They wave toward procedural Rule 15, which governs amendments to pleadings, but offer no argument under that rule. (*Id.*) They provide no explanation and cite no authority showing that, in a situation like this, where a new theory is raised in response to a summary-judgment motion — a motion challenging the residue of a second amended complaint — justice requires (*see* Fed. R. Civ. P. 15(a)(2)) that a late amendment be permitted so that the new theory can breathe continued life into a plaintiff's case.

Second, the Johnsons' delay argument is substantively wanting. It does not raise an issue for trial under Rule 56. The Johnsons do not ground their delay argument in sufficient proof or adequate explanation. For example, they have not provided any evidence showing that the wait between February and April 2014 harmed them. They claim that this delay "enrich[ed]" PNC by "nearly $5000" (ECF No. 69 at 9, 13), but they offer no proof to support that number. They only

---

[21] The Johnsons view their second application as completed on February 22, 2014 (*see* ECF No. 69 at 8); PNC suggests that the Johnsons' application material was complete around March 24, 2014 (*see* Arthur Decl. – ECF No. 67-12 at 2 [¶ 11]). Given that the Johnsons' "delay" theory fails for other reasons, this particular disagreement may be ignored. In roughly this vein, it may be noted that, contrary to the Johnsons' description, May 14, 2014 cannot have been the date on which PNC completed its review of their modification request. (*See* ECF No. 69 at 8.) It is undisputed — and the documentary evidence shows — that PNC approved the Johnsons for a HAMP "Trial Period Plan" (a precursor to permanent modification) in a letter dated April 7, 2014. (ECF No. 67-18 at 2.) The Johnsons signed their acceptance of this trial plan on April 24, 2014. (*Id.* at 5-6.) The Johnsons do not tell the court their source for the May 14th date. (*See* ECF No. 69 at 8-9.)

gesture in the direction of their original note, their December 2013 modification application, and the modification agreement that they ultimately signed. (*Id.* at 9.) It is not this court's job — nor its proper role as neutral arbiter — "to scour the record in search of genuine factual issues regarding [the plaintiffs'] . . . claim; rather, it is the [Johnsons'] job to 'identity with reasonable particularity the evidence that precludes summary judgment.'" *Rodriguez v. City of Moses Lake*, 2008 WL 5205947, *4 (E.D. Wash. Dec. 11, 2008) (quoting *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996)). On this lately added delay theory, they have not done so.

### 2. Unfair Competition Law (Cal. Bus. & Profs. Code § 17200)

The Johnsons' other remaining claim is under California's Unfair Competition Law ("UCL"), Cal. Bus. & Profs. Code § 17200. (2AC – ECF No. 30 at 6-9 [¶¶ 23-34].) "The UCL prohibits 'unlawful' practices 'forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made.'" *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1076 (E.D. Cal. 2012) (quoting *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838 (1994)). The UCL thus "borrows" violations of almost any other law and makes them independently actionable. *E.g., Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992).

(The court should perhaps be more specific here. The Johnsons' operative complaint frames its UCL claim under that law's "unfair business practices" term. (2AC – ECF No. 30 at 6. This part of the UCL reaches "conduct that threatens an incipient violation of an *antitrust* law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms *competition*." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999) (emphases added). Their summary-judgment argument mentions both the "unfair" and "unlawful" prongs of the UCL. (*See* ECF No. 69 at 12-13). Because the "unlawful" rubric is both broader, and conceptually better fitted to the facts and arguments of this case, the court assumes that the Johnsons intend to argue under the "unlawful" prong.)

The Johnsons root their UCL claim in PNC's alleged violation of California's Homeowner Bill of Rights — and, in particular, the "Single Point of Contact" provisions of California Civil Code

United States District Court
Northern District of California

§ 2923.7. (*See, e.g.,* 2AC – ECF No. 30 at 6 [¶¶ 24-25].) The Johnsons originally claimed that

PNC had violated § 2923.7, ultimately, by miscalculating their gross monthly income. But, again,

the Johnsons have abandoned that theory.[22] They do not say so with precision, but the Johnsons'

UCL-via-§ 2923.7 claim now seems premised on the alleged wrongs discussed throughout this

order (the retirement and delay issues, and so on).[23] That is also consistent with the parties' oral

arguments at the summary-judgment hearing.

Because a UCL claim is premised on other violations, it rises or falls with the underlying

infraction. "Where a plaintiff cannot state a claim under the 'borrowed' law, she cannot state a

UCL claim either." *Rubio v. Capital One Bk.*, 572 F. Supp. 2d 1157, 1167 (C.D. Cal. 2008) (citing

*Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718 (2001)). Here, because the

Johnsons have not raised a genuine issue for trial on any of their theories, as discussed earlier in

this order, their UCL claim also fails as a matter of law. *See, e.g., Rubio*, 572 F. Supp. 2d at 1168.

---

[22] The Johnsons initially advanced other factual bases for the alleged § 2923.7 violation (*see* 2AC – ECF No. 30 at 8 [¶ 30]) but those, too, have gone by the wayside. The Johnsons do not proffer them now as grounds for overcoming PNC's summary-judgment motion and proceeding to trial. (*See* ECF No. 69, *passim*.)

[23] *See* ECF No. 69 at 10 ("Because plaintiffs have established that there are . . . genuine issues of material facts surrounding Defendant's negligence . . . , its motion should be DENIED on all causes of action."), 12-13 ("It is established . . . that Plaintiffs' income was overcalculated by that breach of duty because Charlotte's retirement income would be less than her income during her temporary employment . . . Moreover, . . . Defendant negligently delayed plaintiff's modification . . . which . . . is an unlawful business practice . . . .").

1

### CONCLUSION

2      The court is sympathetic to the situation of homeowners like the Johnsons. But, in this case,

3   there is no plausible claim that PNC did anything wrong in calculating the Johnsons' mortgage-

4   loan modification. The court grants PNC's summary-judgment motion and dismisses with

5   prejudice the plaintiffs' remaining claims: *i.e.,* the First and Second Causes of Action in the

6   Second Amended Complaint.

7      This disposes of ECF No. 67.

8      **IT IS SO ORDERED.**

9      Dated: March 7, 2016

10                                          _____

11                                          LAUREL BEELER
                                            United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28